UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Crim. No. 13-CR-042 (ABJ) |
| LINDSAY BRANSON, | ) ) | |
| Defendant. | ) ) | |

**LINDSAY B. BRANSON'S MEMORANDUM IN AID OF SENTENCING, OBJECTIONS TO PRE-SENTENCE INVESTIGATION REPORT, AND <u>MOTION FOR DOWNWARD DEPARTURE</u>**

On July 22, 2013, Mr. Lindsay B. Branson, III, the defendant, entered a plea of guilty to one count charging him with making a false statement in violation of 18 U.S.C. § 1001. He will appear before this Honorable Court for sentencing on November 5, 2013. Through undersigned counsel, Mr. Branson respectfully submits the following information and argument for the Court's consideration in determining an appropriate sentence.

Mr. Branson is a long time federal public servant and first time offender. Mr. Branson pled guilty to the felony offense of submitting a false statement in March of 2011 while working for the United States Office of Personnel Management ("OPM"). His job was to conduct federal background investigations. Having pled guilty and accepted responsibility for his offense, the defense respectfully requests what is common in false statement cases involving defendants with no prior criminal record: a sentence of probation. A sentence of probation coupled with Mr. Branson's agreement to make full restitution to the government in the very high amount of approximately $159.918.09 is well supported by the 18 U.S.C. §3553 factors, including the

properly-calculated Guidelines range.

## BACKGROUND

**A.     Lindsay B. Branson, III.**

Mr. Branson is 58 years-old.  He grew up in Bethesda, Maryland in a home that instilled in him a strong work ethic.  After graduating from high-school at Walter Johnson High School, he attended Montgomery Community College in Maryland, while saving money to attend a four-year college.  In 1976, Mr. Branson received a soccer scholarship to attend the University of North Carolina in Wilmington and graduated with a Bachelor of Arts in 1978.  After a time working as a handyman, he began his career with the federal government as a clerk typist but thereafter pursued a career as an investigator.  He began work at OPM in 1983 and worked for OPM and then United Sates Investigative Services (a contractor that took over OPM's background investigations) until 1999.  From there he joined the Department of the Treasury's Bureau of Engraving and Printing as an investigator.  He returned to OPM as an investigator in 2009.  Mr. Branson retired from OPM and the federal government in February 2013.
Mr. Branson was married in 1987 to Nelly Branson, who has written a moving letter to Your Honor on her husband's behalf.  See Ex. 1 (letters to Your Honor from friends and family of Lindsay Branson).  The couple has two daughters Susan (age 22) and Molly (age 19) who the Bransons saved long and hard to help put through college; a dream that is currently being realized.

The stress of this criminal case has undoubtedly taken an enormous toll on Mr. Branson's personal life over the last several years.  The allegations in this case first surfaced in 2011 and Mr. Branson was placed on administrative leave in 2012.  See PSR ¶ 59.  Although there are

likely other factors at work as well, Mr. Branson and Nelly Branson were divorced in 2012, though the split was and is still a very amicable one. Similarly, Mr. Branson acknowledges that his consumption of alcohol has grown problematic since this ordeal began. He drinks more often than previously and believes as of today that he could benefit from help with respect to his alcohol use. Based on Mr. Branson's own request – a request counsel views as a very positive step in his recovery – the defense respectfully asks that alcohol counseling be made part of his conditions of release following sentencing so that he will have help in this struggle.

**B.     Offense Conduct**

The offense conduct is set forth in the PSR and will not be repeated in full here. After a career of government service, Mr. Branson did a stupid thing and cut corners in the execution of his duties. Mr. Branson told his employer that he had sufficiently interviewed a source as part of a background investigation when he had not. Although there is no indication that anyone whom received security clearance after being investigated by Mr. Branson was later determined to be unsuitable, Mr. Branson recognizes that his false statement was illegal and had the potential to cause harm. As noted in the PSR, Mr. Branson takes full responsibility for his actions and is thoroughly remorseful.

Undersigned counsel has now investigated the facts of this case and several other OPM background investigation cases. What happens in these cases is that an investigator is assigned to conduct a background investigation. The investigator does this by interviewing both the "subject" (the applicant for the position) as well as a certain number of sources who were acquainted with the subject through mutual employment or other means, such as having been neighbors. Thus, one major part of the job is to track down and interview the sources to produce

the Record of Investigation ("ROI").

The background investigators involved in these cases either conduct an inadequate interview of a source or they do not conduct the interview at all. Although Mr. Branson's case involves far fewer of these instances than the other OPM background investigation cases, the pattern in these cases that counsel discerns is as follows: The investigator repeatedly makes an effort to contact a source about a subject. After contacting eight or so other sources who all approve of the subject and all say similar things about the subject's fitness (i.e., that he or she is fit for the position), the background investigator is still having problems pinning down that ninth source, because the source will not return phone calls, is on vacation, etc. The investigators are under very tight deadlines (especially since 9/11 with the explosion in positions requiring clearances), and have difficulty getting extensions. Thus, relying on either an incomplete or nonexistent interview, and using the information gained from the other eight sources as well as from the subject, the investigator indicates that the ninth source has signed off as well.

None of the above is said to minimize the investigators' misconduct. It is only to point out that these situations are somewhat different than the government makes them appear, which often leaves the impression that investigators are fabricating entire ROIs from whole cloth. That has never been the situation in undersigned counsel's experience and, with all due respect to the government, overstates the risk involved in these cases.

## DISCUSSION

I.  **THE 3553(A) SENTENCING FRAMEWORK**.

Courts are required to impose a sentence "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of [§ 3553(a)]. See 18 U.S.C. § 3553(a).

Those purposes require the sentence imposed:

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)   to afford adequate deterrence to criminal conduct;

(C)   to protect the public from further crimes of the defendant; and

(D)   to provide the defendant with the needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). Subsections (A) through (D) of § 3553(a)(2) thus highlight the primary purposes of sentencing while the remainder of Section 3553(a) enumerates the six other factors the Court must consider in determining a particular sentence, including the nature and circumstances of the offense and the defendant's history and characteristics (§ 3553(a)(1)); the kinds of sentences available (§ 3553(a)(3)); the kinds of sentence and the sentencing range established by the U.S. Sentencing Commission (§ 3553(a)(4)); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct (§ 3553(a)(6)).

The U.S. Supreme Court in United States v. Booker held that judges are required to consider the U.S. Sentencing Guidelines together with other statutory sentencing factors set forth in 18 U.S.C. § 3553(a). 543 U.S. 220, 259 (2005). There is, however, no requirement that a sentence imposed be within the guidelines range. Id. at 261. Since Rita v. United States, courts have been instructed to consider challenges to individual sentencing guidelines where the guideline itself fails to properly reflect § 3553(a) considerations, reflects an unsound judgment, does not treat defendant characteristics properly, or where a different sentence is otherwise appropriate. 551 U.S. 338, 351 and 357 (2007). "Judges may vary [from the guidelines range]

based solely on policy considerations, including disagreements with the Guidelines." Kimbrough v. United States, 552 U.S. 85, 101 (2007) (internal quotations omitted); see also Gall v. United States, 552 U.S. 38 (2007) (upholding a probation sentence where the Guidelines range was 30 to 36 months after holding that a sentence falling outside the recommended Guidelines range is not presumptively unreasonable).

**II.     THE SECTION 3553(A) FACTORS AS APPLIED TO THIS CASE.**

As detailed in the following sections, Mr. Branson is a first-time offender who has otherwise spent his life in service of the federal government. Mr. Branson pled guilty to submitting a false statement while working as a part-time contractor to another contractor working to assist the U.S. Office of Personnel Management in completing background reviews. Having pled guilty to a felony offense and agreed to pay a truly significant amount in restitution ($159,918.09, for money he never saw), the defense respectfully submits that Mr. Branson should receive a sentence of probation. A sentence of probation coupled with Mr. Branson's agreement to make full restitution to the government even for cases since confirmed to have been properly completed is fully consistent with the § 3553 factors, including the properly-calculated U.S. Sentencing Guidelines range.

**A.     Lindsay Branson's History and Characteristics.**

Mr. Branson is now retired and the father of two daughters currently in college. Prior to this matter, Mr. Branson had never been convicted of any criminal offense. As all of the letters from Mr. Branson's family, friends, and colleagues attached as Exhibit 1 say better than defense counsel ever could, Mr. Branson has made and continues to make a positive difference in the lives of many others. See Exhibit 1 (letters to Your Honor from friends and family of Lindsay Branson).

B.  **The Nature and Circumstances of the Offense**.

In this case, the government asserts that it was required to re-work 217 of Mr. Branson's cases at a supposed cost of $159,918,09, which includes the assigned OPM agents' salary, benefits, travel time to and from a multitude of places, and apparently thousands of dollars of OPM agent overtime.[1]

As discussed below in more detail, the $159,918.09 cost figure significantly overstates the severity of Mr. Branson's offense because, inter alia, it includes the government's cost in reviewing every report and every source submitted by Mr. Branson over an extended time period, even though the government has confirmed that Mr. Branson performed the overwhelming majority of those interviews in full compliance with OPM policies and procedures.

C.  **The Advisory Guidelines**

Properly applied, and with an appropriate downward departure expressly provided for in the applicable guideline, see infra, the U.S. Sentencing Guidelines place Mr. Branson in Zone A and recommend a sentence range of 0 to 6 months' incarceration.

As part of Mr. Branson pleading guilty and accepting responsibility for submitting one false statement in violation of 18 U.S.C. § 1001, the parties stipulated that — in the absence of a departure under § 2B1.1, Commentary, Application Note 19(C) — the loss amount is the full amount the government spent to review all of Mr. Branson's background investigations ($159,918.09) – even though at most only 4.3% of those cases involved so-called "confirmed falsifications." Recognizing that the Guidelines' range in this case is driven almost entirely by the so-called loss and that the

---

[1]   The defense has not been provided with any explanation for why costly overtime was necessary in this case.

$159,918.09 figure <u>significantly</u> overstates the seriousness of his crime, the defense reserved the right to seek a downward departure pursuant to Section 2B.1, Commentary, Application Note 19(C), for overstatement of loss. The parties also agreed to litigate whether Mr. Branson abused a position of trust in committing or concealing his offense, as defined in Section 3B1.3. Finally, Mr. Branson may seek a sentence outside of the Guidelines range based on § 3553(a) factors.

### 1.     The Downward Departure Based on Loss

Owing to the agreed restitution in this case, there is no risk of ignoring the actual costs incurred by the government in reworking all 862 sources. The issue is whether Mr. Branson should be punished as if he had falsified 862 sources when the government's own review concluded that he falsified <u>fewer than one-in-20</u> (actually 4.3%) of those source interviews.

In sum, the government contends that the amount of loss is equal to the $159,918.09 in costs incurred to re-work all 862 sources referenced in Mr. Branson's reports, even though the government's thorough review of Mr. Branson's cases determined that only 4.3% of those source interviews contained falsifications. This approach places Mr. Branson in the exact same category as defendants who intentionally and greedily misappropriated up to $200,000 for their own personal use, substantially overstates the seriousness of Mr. Branson's offense, and distorts the purpose of the Guidelines' loss provision, U.S.S.G. §2B1.1. The U.S. Sentencing Commission recognized this risk and so provided an express remedy for this situation — §2B1.1, Commentary, Application Note 19(c). That provision states: "There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted."

Mr. Branson respectfully requests this Court grant the downward departure the Sentencing

Commission authorized to ensure that his Guidelines Offense Level distinguishes his relative culpability from that of an identically-situated person who falsified 862 sources, something Mr. Branson did not come remotely close to doing, and in fact is over 20 times worse than what he did. According to the Guidelines, "the sentences of defendant convicted of federal offenses should reflect the nature and magnitude of the loss caused or intended by their crimes. Along with other relevant factors under the guidelines, loss serves as a measure of the seriousness of the offense and the defendant's relative culpability and is a principal factor in determining the offense level under [§ 2B1.1]." U.S.S.G. §2B1.1, Commentary, Background. Without a downward adjustment, Mr. Branson's Guidelines sentence range would be the same whether he falsified one source in one case or all 862 sources. This ignores the significant difference in culpability between those two courses of conduct and thereby substantially overstates the seriousness of Mr. Branson's crime. See U.S.S.G. §2B1.1, Commentary, Application Note 19(c).

In United States v. Jasper, 12-CR-163 (BAH), Judge Howell, a former Commissioner on the United States Sentencing Commission, highlighted this very problem during the sentencing of another background investigator convicted of submitting a false report to OPM. In sentencing Ms. Jasper to probation, Judge Howell observed that:

> The problem with using the loss amount to measure her culpability here under 2B1.1 is if Miss Jasper had falsified every single source of the 730-plus sources in all 226 cases, her Guideline offense level would be exactly the same as if she only falsified one report or what OPM was able to find, 21 percent of the cases.

United States v. Jasper, 12-CR-163 (BAH), Transcript of Sentencing Hearing, 24 (Exhibit 2).

> The loss amount in this case is not a good measure of the defendant's culpability where the defendant did not falsify every report she submitted but only some of them. The loss is calculated as if she did absolutely nothing for ten months but falsify every report and, thus, it is an overstatement of her culpability.

Id. at 39.

A comparison between this case and the facts of United States v. Ramon Davila, 11-CR-00279 (ABJ), is similarly useful and demonstrates the flaws in the government's loss arguments. In the *Davila* case, OPM reviewed 415 cases, as opposed to the 862 reviewed here. But in Davila, there were allegedly 72 "confirmed falsifications," whereas in this case there were only 37. Mr. Davila's falsification rate was 17%, whereas Mr. Branson's was only 4.3%. And yet, government's alleged loss (and restitution) figure – $159,918.09 – is nearly twice Mr. Davila's figure of $79,468.[2] That simply makes no sense, and makes crystal clear that the government's loss figure is not driven by what the defendant did, but rather simply by how many cases and sources OPM chooses to review. That is a very poor proxy for a defendant's culpability.

With all due respect to the government, arguing for a much greater loss amount in a case with much less criminal conduct turns § 2B1.1, § 3553(a), as well as common sense, on their respective heads. As Judge Howell found appropriate to do in Jasper, Mr. Branson respectfully requests this Court depart downward by seven levels to arrive at a better measure of Mr. Branson's culpability. There are at least two convincing rationales for why seven levels is the appropriate level to depart. They are set forth below.

      **a.**    **The Government's 4.3% Falsification Rate Against The Cost of the Recovery Effort.**

The $159,918.09 cost incurred by OPM in re-working all 862 sources submitted by Mr.

---

[2] Similarly, in United States v. Kristen Jasper, 12-CR-163 (BAH) – where the defendant also received a sentence of probation – there were 47 "confirmed falsifications" for 723 sources, thus also featuring a higher absolute number (47 falsifications), as well as a much higher rate (15.4%).

Branson is not a good measure of Mr. Branson's culpability because it assumes that Mr. Branson falsified all of the work he performed when, in fact, the government has confirmed that he did not. Even accepting the government's internal conclusion, Mr. Branson falsified fewer than 1-in-20 (4.3%) of those 862 source interviews. One way to translate these findings to relative culpability under §2B1.1 is to apply the government's 4.3% rate to the total cost incurred by the government to re-work all 862 sources (4.3% of $159,918.09) and use the resulting figure – $6,036.00 – as the loss figure instead. That would result in a seven-level reduction in Mr. Branson's Guidelines Offense Level, from a 13 to a 6. Compare § 2B1.1(b)(F) (more than $120,000 but less than $200,000 adds 10 levels) with § 2B1.1(b)(B) (more than $5,000 but less than $10,000 adds 2 levels). This approach more accurately reflects Mr. Branson's relative culpability by not treating Mr. Branson as if he had falsified all 862 sources when he did not.

    b.  The "Ill-Gotten Gains."

Another measure of Mr. Branson's relative culpability is to determine the value of the property he sought to obtain from his conduct, i.e., his financial compensation for performing the background investigations. This approach reflects what Mr. Branson actually gained from his alleged criminal conduct, which is how "loss" works in the overwhelming majority of fraud cases under § 2B1.1. It also more appropriately reflects the reasonably foreseeable loss associated with falsifying a case because the government, needing this assigned work to be completed in any case, could reasonably be expected to hire a second person to do the work that was not done properly the first time. See U.S.S.G. § 2B1.1, Commentary, Application Note 3(A)(1) (defining "actual loss" with reference to what was reasonably foreseeable).

Mr. Branson's salary from OPM for the year 2011 was somewhere between $84,000 and

$97,000. See PSR ¶ 59. According to the government, the criminal conduct took place from January 2011 to November 2011, but even taking Mr. Branson's salary for the entire year and even using the higher salary figure of $97,000, 4.3% of Mr. Branson's salary is **$4,171.** That figure is the full extent of Mr. Branson's ill-gotten gains shown in this case, which is exactly what § 2B1.1 is meant to (and usually does) capture in measuring loss.

### 2. The Enhancement Based on Abusing a Position of Trust.

In sentencing defendant Ramon S. Davila in United States v. Davila, 11-CR-00279 (ABJ), this Court recently ruled that background investigators such as Mr. Branson do not hold qualifying "positions of trust" as that term is defined in the United States Sentencing Guidelines. See U.S.S.G. § 3B1.3, Commentary, Application Note 1 (defining a position of trust as one with "professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference. Persons holding positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature."). There was nothing about Mr. Branson's job or his conduct in this case that materially distinguishes him from Mr. Davila. Thus, the defense will not reproduce its entire argument on this issue here, but incorporates its legal arguments on this issue from the Davila case by reference, and respectfully submits that the Court should decline to apply the position-of-trust enhancement.

### D. The Need to Avoid Unwarranted Sentence Disparities Among Defendants With Similar Records Who Have Been Found Guilty of Similar Conduct.

The sentence of probation that Mr. Branson requests is consistent with the sentence that the majority of other similarly-situated defendants have received in this District and across the United States. The defense has identified a number of similar prosecutions involving former background

investigators working for OPM's benefit that have occurred since 2007. Of the 16 defendants in Mr. Branson's same position, i.e., those who pled guilty and accepted responsibility, eight received sentences that did not include any period of incarceration, including Ramon Davila. This includes two of the last three background investigators sentenced (Ms. Jasper and Mr. Davila).

### E.     The Purposes of Sentencing.

Given Mr. Branson's history and lack of intent to cause harm, a sentence that does not involve a period of incarceration is sufficient to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence to criminal conduct.

Mr. Branson is now a convicted felon. This conviction will have significant consequences on Mr. Branson for the rest of his life, most notably from the shame attached to this designation, especially after a lifetime of public service.

No period of incarceration is necessary to protect the public from Mr. Branson. As the U.S. Sentencing Commission has recognized, defendants with no prior contact with the criminal justice system are unlikely to recidivate. See United States Sentencing Commission, Recidivism and the First Offender, Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate (May 2004) (noting that offenders with no prior arrests or convictions have the lowest recidivism rate).

Nor is a term of incarceration necessary to deter others. Mr. Branson now has a felony conviction with all of the collateral consequences and will continue to be punished for his conduct for the rest of his life. To the extent that background investigators will be deterred by the punishment of others, Mr. Branson's felony conviction, $159,918.09 in restitution to be paid, job loss, and

damaged reputation will act as a sufficient deterrent to any similarly-situated individuals.

  **F. The Kinds of Sentences Available.**

  Here, rather than imposing a period of incarceration, the Court can and should impose a period of probation with significant conditions, such as home confinement with electronic monitoring and community service. A sentence of probation with conditions itself is a substantial restriction of freedom. As the Supreme Court has explained:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. See United States v. Knights, 534 U.S. 112, 119, 122 S. Ct. 587, 151 L.Ed.2d 497 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled' " (quoting Griffin v. Wisconsin, 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987))). Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. U.S.S.G. § 5B1.3. Most probationers are also subject to individual "special conditions" imposed by the court.

Gall, 552 U.S. at 595-96 (footnote omitted).

  **G. The Need to Provide Restitution to Any Victims of the Offense.**

  As noted above, Mr. Branson has agreed to pay $159,918.09 in restitution — the full cost of the government's recovery effort, including OPM agents' salary, health and retirement benefits, as well as overtime. This is so even though Mr. Branson correctly performed — and the government has confirmed that he correctly performed — the vast majority of the work that OPM reviewed.

## CONCLUSION

For all of the foregoing reasons and such other reasons as may be presented at the sentencing hearing, the defense respectfully submits that the Court should impose a sentence that substitutes a term of home confinement with electronic monitoring for any term of incarceration, plus restitution.

Respectfully submitted,

Dated: October 31, 2013

/s/ Jonathan Jeffress

Assistant Federal Public Defender
625 Indiana Ave., NW, Ste. 550
Washington, DC 20004
(202) 208-7500

/s/ Ann Mason-Rigby

Crowell & Moring L.L.P.
1001 Pennsylvania Ave., NW
Washington, DC 20004
(202) 508-8802

**Counsel for Defendant Lindsay Branson**